Good morning, Your Honors. My name is Craig Orent. I am a Deputy Federal Public Defender out of the District of Arizona in the Phoenix Division, and I represent Ms. King in this matter. At the risk of appearing as though I'm punting on this issue, which I am not, I do not want to stand here and repeat everything that's in my two briefs. We take this as a time for elaboration. And I hope that you're not waiving any argument. Thank you, Your Honor. We appreciate you focusing on the arguments you think you need to comment further on. And that's my point. Given the nature of our appeal and our claim that the government had the burden and failed to meet its burden and did not present sufficient evidence, I will submit on the briefs, and unless Your Honors have questions for me or areas you would like me to clarify, I would like to reserve the remaining portion of my time for any rebuttal that I believe is appropriate. And I would defer to the government at this time. But let me ask you this. Your client admitted that she was either in one of the stolen cars or was getting into it. I don't believe that's correct. And if that was correct, Your Honor, I may be wrong on that. I don't remember her making that admission. But if that were the case, it would have been after the seizure. And I think she said it to the agent who was questioning her. And that would come after the fact. And as I cite in my question. Well, that's just to establish the fact of why she was handcuffed and put into the patrol car. But that was in the context of Detective Shea asking questions about whether or not she would grant consent to search the hotel room. And I'm not conceding that that question was asked. I assume it was if Your Honor is raising it. Well, I think I read it. But so if, in fact, the detention was okay, she hadn't been detained for more than four or five minutes by the time Shane started to question her. So I guess the real issue, at least for me, is whether he was justified or could legally ask the kinds of questions that he asked. The stop, apparently, or the arrest or detention was for stolen automobiles. And that's not what he talks about. That's correct. And that is part of our position. There are a number of different segments to our claim, and each of which we feel we can rely on in succeeding here in what we felt we could rely on in succeeding before the district court. First, the government presented no evidence, raw evidence, no testimony that the district court, or this Court for that matter, could consider in making the fact-intensive determination as to whether or not Ms. King's seizure was an arrest supported by probable cause or a reasonable detention under Terry and not prolonged. That's the first part. Well, now, what cases do you have that says that's the government's burden? Well, I believe the Fourth Amendment itself, Your Honor, requires that when someone is seized, when their person is seized without a warrant, there's a presumption that it's invalid unless the government comes forth, and it's their burden, to establish an exception to the requirement of a warrant. And in this case, the exception would be probable cause to arrest established before the court or under Terry v. Ohio, a reasonable suspicion that a crime had been committed. Well, if the car hadn't been stolen, I think you'd have a very sound argument. But we have a stolen vehicle, and she's in the vicinity, right? Well, part of the problem, with all due respect, Your Honor, with that is I believe that involves some speculation. The record does not specifically conclude or indicate that the car was stolen. We have Officer Shea testifying as to why he was acting the way he was, but no officers came into the court and no affidavits were presented establishing that the car, in fact, was stolen. In fact, no testimony was presented whatsoever as to what Ms. King's connection to the car was, other than what Your Honors, Judge Fletcher, stated a few moments ago, which was subsequent to the seizure and Officer Shea contacting her, as to what Ms. King's connection to that car was. She could have been a passenger. She could have been approaching the car. She could have been one foot from the car. She could have been 20 feet from the car. In fact, on this record, there's no indication that she had any connection to the car whatsoever. On this record, it's quite possible, and I admit that I'm speculating, but I'm doing as much as I suggest the government is going to have to do and the district court did. It's quite possible that whoever arrived at the hotel complex in that car went up to the hotel room, met Ms. King, and Ms. King was coming back to the car to get something, one of her belongings or whatever. And then she was immediately seized. And what I think is salient here is no one, no one ever asked her, in the context of this seizure, even if it's just a minimal seizure for, you know, just an investigatory detention, no one came up to her and said, how do you know, do you know the driver? What's your connection to this car? What's your connection to this person? Did you know the car was stolen? And under the road case, which I cited in my brief, simply being a passenger in a car is not sufficient for an arrest, to establish an arrest. There has to be additional facts to support that, and none of there was no evidence presented to the district court on which the district court could rely in making that determination. But I talked about the first segment. The second segment, to address what I think Your Honor was Judge Fletcher was getting at a while ago, the second segment of this, which I think should permit us to succeed, is even if we assume, and I don't think this Court can do so given the lack of evidence, but even if we can assume that this was a Terry detention, it was prolonged. Detective Shea was the only officer to confront Ms. King. He testified, he opened the door, gun on his knees, there she is in the car with cuffs. The first words out of his mouth, according to his own testimony, is, up until now, this has been a car theft investigation, implying that from this, and it has not been, what he said is, up until now, this has not been a drug investigation, implying that from that point forward, it would be. And then he said, you're no longer being considered for that, you are under, you're still being detained, you're not free to leave. At that moment, that Terry detention has become prolonged and was unlawful. And then the third segment is, even if this Court were to say, hey, you know, let's assume for the sake of discussion that the seizure was unlawful, for whatever reason, the question that the government raised in its response to my opening brief is, well, is the consent that was given untainted or sufficiently attenuated so that it can be admitted? And I think I've addressed that quite clearly, I hope, in my reply, citing the D'Agadillo case and the Brown case. The D'Agadillo case, the facts are not identical to the facts here, but if anything, they're stronger in terms of pointing toward the legality and the acceptability of the consent in that case. And in our case, the facts were more favorable to us. She was arrested. Yes, she was given her Miranda warnings, but within minutes, you know, she was asked to give the consent. There was no intervening circumstances whatsoever. And although the officer did not, as far as we know, because very little evidence was presented, although the officer did not engage in, you know, improper conduct, I guess one could say, that, as I point out in my brief, is not the standard. The standard is whether they accomplished their goal, which they did. If you assume they stopped her because she was connected to the car, they accomplished that. And he said that in his own testimony. We separated her from the car, and yet he started to conduct a separate investigation. With that, Your Honor, I'd like to reserve my last minute and a half. You know, there was a motion to suppress, which was made to the Court of Appeals. Excuse me, I wanted to ask you. I was looking at the record, and it says, this is Ms. King's motion to suppress. The truck had two occupants. Ms. King was the passenger. And then she returns to the hotel room, and the officers converge on the truck, and at gunpoint arrested Ms. King and the driver. Ms. King was handcuffed and placed in the back of a police car. That's correct, Your Honor. Well, that's correct that that's what it states, and that's what I wrote. And when I brought the omission or the failure of the government's proof to the attention of the district court, Judge Martone, I think, as I said in my brief, he recognized the government's failure and then inquired as to whether or not it could rely or he could rely on that summary of facts in my motion, and I objected to that. And he he Why did you object to it? Because, as I said below, and I'll say to this Court now, we I'm sorry? Where did you speak? It was in argument. I can, if Your Honor wants me to, I can get the transcript. It was at the very end. But you submit this written motion, and did you somehow retract it? No, I did not retract it. My point to the Court then was that those facts were all that I could glean from the limited amount of reports that were presented to me. There were no reports prepared by the government or police officers that fully accounted for this encounter, and we were unable to interview the witnesses. They refused to grant us an interview. Well, but they had checked the registration and the truck was stolen. Is that correct? Well, that's what they claimed from the reports, but it's not before the record. And as I said, Judge, this issue was not raised in the you know, although the Judge Martone But you submitted a statement of facts to the Court, which you would seem to accept this. No, I don't. You didn't accept the fact you stated. I was simply presenting what the government said. And if Your Honor looks at the footnote on my – in my motion, I specifically point out that the full story will have to be clear. No, but you say additional facts, but you don't say that these facts are disputed. I mean, how can you – you tell the Court these are the facts, a large type that says facts. You say additional facts may be needed, but you say in the report that the vehicle was stolen. There are two occupants, Ms. King was the passenger. I agree. And as I said to Judge Martone in the district court, in hindsight, I could have been more artful in explaining all those facts. More artful. You were very candid. You admitted what appeared undisputed. No, I – I mean, you could have admitted none of this, of course.  Well, Your Honor, if I had not presented any of that, the court could have – the district court could have denied me an evidentiary hearing. Well, if you didn't agree with this, why didn't you say so? As I said, I should have. But when Judge Martone – When you make a statement to a court, these are the facts, the court is entitled to believe that you were stating them as facts that you accept. Well, I did – we did not brief this issue, of course, Your Honor, and if it's – Well, I know, but you stated this to the court, you submitted it in writing, you thought about it. I agree. And what my point is, is that I was prepared to address this issue had it been raised by the government or even alluded to by the judge in his ruling. There are cases from this Court that address when a submission by a party can be accepted as fact. And there is a case, in fact, and this is just purely based on memory because we didn't brief this, that deals with the suppression issue. And I'm not presenting that as fact. As is implied – The question just seems evasive. My statement or what's in the – What you're saying now about what you submitted to the court, you seem to be trying to evade responsibility for it. As I said to the court in argument, and we spent a lot of time on this – Is this part of the record? Yes. It's in the transcript, toward the back of the transcript. Where is that? It's – may I have one moment? Do we have it? Yes, Your Honor. It's in the record. It's the reporter's transcript of the proceedings. Okay. And where we address this issue, as I believe it's – this issue, or my argument starts at page 41 of the reporter's transcript. And then the specific issue that Your Honor, Judge Newnan, is raising is at page 44, line 11. Okay. But in fact, at the hearing, the officer testified that she was involved with the stolen cars. Now, whether or not he was a percipient witness or not may have been at issue, but that wasn't – didn't seem to be particularly raised in the – at the evidentiary portion. Because he says they had two people that occupied one of the vehicles. At that time, I asked if they – he goes on to say he goes up to room 211. And he says, I went down, contacted the first officer. They had identified the male subjects. I left the defendant, Mrs. King, whom no one was talking to at the time. The people – he says the people that were in the car were detained, and everyone else was brought into the parking lot area just under the room. So it's true he may not have been a percipient witness, but the only evidence in there was that she had some connection with the stolen vehicle. And so we have – you would agree, I think, that if that's true, it's a permissible Terry stop. No. With respect to the case law indicates the determination as to whether a stop is valid, a Terry stop or an arrest, is fact-intensive. And assuming even what Judge Noonan has brought up, assuming that you can and do adopt my statement of facts in the motion and the hearsay statements, which I did not object to, but those hearsay statements, I suggest, as I did in my brief, that that's not sufficient for this Court or the district court to make that fact-intensive determination. As I said in my brief, we don't know – we don't know how they treated her. We don't know how many police officers were there. Did they slam her to the ground? Did they – No, no, I'm just talking about the point where she was detained. Now, what happened after the detention or in the manner of the detention I'm not getting into, but at least if she is a passenger in the car, a stolen vehicle, they have reasonable suspicion to make a Terry stop. Your argument is the Terry stop was prolonged. I understand that part, but I'm separating the analysis now. I agree that in the abstract, that if – that if a – if Ms. King was a passenger in their vehicle and the court finds that that has been established, however it's established, that that would give the officers reasonable suspicion to detain her. But that doesn't get the government over the hump, because simply because they – simply by having the right to detain her does not mean that that's what they did. You know, we – they still have to establish whether or not the seizure was in fact limited to a Terry stop or did it convert to an arrest. And they presented zero evidence as to that. And I think in order for them to meet their burden, they have to do more than simply saying, well, we had some suspicion, and therefore we have the right to detain her. It's fact intensive. And that's why a moment ago I got into, you know, something that went beyond Your Honor's question, I guess. Right. Maybe I misheard you, but I thought you said page 44, line 11, is where you qualified some other page. What? That's correct. Of the reporter's transcript of the scene. Well, what I read there, it's about his answer. There's mail in here that's probably stolen. What does that have to do with it? I'm not sure. Maybe we're not looking at the – Well, I'm looking at page 44. I'm sorry, Your Honor. That's my fault. I'm looking at page 45 of the reporter's transcript as opposed to citing to you the page of the excerpt from the record. I apologize. So are the pages at the top? It's page 48, Your Honor, of the – 48, not 48. Of the excerpt of the record, but page 44, if that makes sense, of the transcript. I apologize. Page 445 of the transcript. Which one? I'm sorry. Well, it starts at – I've confused everybody. In the excerpt of the record, the base stamp would be page 48. Yes. You're just talking about your statements on page either 48 and 49 or 44 and 45. I was just simply pointing out to the Court that that's where the whole issue was addressed. I don't know that – I don't – So we look at the top number, it's 48. Is that right? No. The top number is 44, Judge. All right. Top number is 44. And you look down at line 11, which says, the Court, let me ask you this. Correct. That's where it starts, where Judge Martone raises the issue that Your Honor has raised. Oh, I see. Okay. And then I – You say they're not undisputed. And then we argue that, and the government did not address it when it stood up the law to respond. And then when Judge Martone issued his ruling, he did not say he was taking facts from my motion, and therefore, although I was anticipating that argument arising here, it never was brought up by the government, and therefore, I did not bring the cases with me. I did not cite, you know, address that issue in my briefs. But I – Well, where do you say those facts are not true? Oh, I didn't say they're not true, Your Honor. I kind of – You presented them to the Court. You don't tell the Court they're not true. You say you need more facts, of course. Well, he says at the bottom, 45, in no way, Your Honor, was I intending for this Court to rely on facts as I replied to the Court. Correct. Let's see. See, this is – That's right. That's not correct. No. No. It's over here. Right. I guess my point is I am not – I was not then in a position to be the fact finder. I wasn't signing that as an affidavit. I was as an officer of the Court, inartfully, as I admit here, and to the judge below. Yeah, but you go on for the next couple of pages, and the Court says, well, where did you get them, get the facts? I mean, the Court says on 47, you didn't make these up out of whole cloth. You say there's no police report. Where did you get these facts? They're fairly specific. And you say a compilation of different reports received from the government. That's correct. That's this. Say a postal inspector officer arrested someone, not Ms. King, et cetera, et cetera. But do we really have any reason to believe she wasn't the passenger? I mean, you've asked this, and we've spent a lot of time on it, saying, look, I don't want to be strung up by my motion. Fair enough. But what basis do we have of saying that she wasn't the passenger or they didn't have reasonable suspicion to arrest her in the first place? Or, I mean, the detainer in the first place? I see your point, and I guess it, in my view, it really doesn't affect my argument. So I, standing here today, if it's appropriate, I can concede for the sake of this argument that she was a passenger, but my response figuratively would be, so what? You still have to be the – what it does is, as Your Honor indicated a minute ago, it raises a suspicion, permitting the government, the officers, rightfully to at least question her, but that's not what happened. And, well, I can't even say that's not what happened, because the evidence hasn't been presented to this Court as to what, in fact, happened. Again, did they come at her with 30 guns and, you know, slam her down to the floor and cuff her arms and her legs and drag her to the car? We don't know any of that. But it's your burden on the suppression motion. And you would have told us that if that had happened. Respectfully, it's not – it's not our burden. It's the government's. On the suppression – on a suppression motion, it's your burden. I – I think that the cases are quite clear, if Your Honor will give me a moment, that in a warrantless situation, which this is, the government has the burden of establishing the validity of the search and seizure. Your Honor, I don't think that's the case. Well, that's a different question. I'm talking about the establishment of the facts that presented the, you know, the Terry stop. I'm not sure why I would have that burden. I don't have any – this is, with all due respect, completely new to me. I've – in a warrantless situation, I've never heard of the defense having the burden of establishing the validity of – or presenting facts that would allow the government to establish the validity of a – So your position is you just have to file a motion and the government has to put on evidence, period? It's not that simple. And that gets us back to what Judge Noonan was saying. I have a – under – not necessarily under the Constitution, but under Federal rules. Yeah. And that's what I was trying to meet. Well, that's what we're talking about. So what was the purpose of your presenting these facts you didn't believe in? I'm not – I never said I didn't believe in them, Your Honor. And that's what I'm saying. I didn't – What was the purpose is my question. To get us over the hump so we can have an evidentiary hearing. What do you mean, get you over the hump? Either they're facts or they're not facts. You can't just make them up and – Well, I did – As a way of getting over a hump. But I did not make them up. As I – as I said in argument, those are from whatever police reports I could glean. Unlike the State, we don't have the right to interview the officers. I tried to interview the officers. And so I put forth what we had from the reports. And I felt that was sufficient to get us an evidentiary hearing. And as – as I think Your Honor even concluded in the Batiste case, which is not cited because, again, this issue was not raised, United States v. Batiste, it really doesn't matter because the judge has the ultimate discretion, the district court, to hold an evidentiary hearing. And he decided to hold one, indicating, at least in his mind, that there was some factual issue that had to be resolved. Right. But here's the problem, though. I mean, you get to all this point, you get to the evidentiary hearing, and you have testimony that says this person was arrested because she was connected with a stolen car or detained. Now, was he a precipient witness? We don't know. But you didn't challenge that on cross-examination. No, I did. I did. And he admitted that he was not a precipient witness. All right. So he says that she was. We have no other evidence to say that she wasn't. We have no evidence to say that – about the force was used improperly. If I suspect your client would have testified about many guns and officers testifying if you thought that that was an issue. But it seems to me it's pretty clear that they had reasonable suspicion to detain her. Now, what happened in the manner of detention, how long it was, what questions were asked, that's an entirely different question. But at least from this record, you don't have to show much to at least establish some minimal cause. They didn't pick her up off the street. Well, clearly that's true. But I guess I'd beg to differ with the implication that, as I said earlier, by simply  its burden of establishing the legality of the stop, under Terry v. Ohio and this Court's cases, it's not simply having a reasonable suspicion. No, but that's the first component that you seem to be contesting, is that she's not the passenger in the car. We don't know that. We don't know what she could have been doing. And from all of the – at least the only evidence in the record that we have is that she had a connection to the stolen vehicle, that she was coming out of the room and either a passenger in the car or in the car when this occurred. And it seems to me we're wrangling a lot about stuff that probably doesn't make much difference to your case and that you've got to concede. I mean, you're saying it's their burden to show that she was a passenger, but they – you know, you put on testimony. You attacked it saying it wasn't precipitant. You know, I agree with that. I think earlier I conceded for the sake of this hearing and this argument that she's a passenger and the officers have reasonable suspicion. Yes, so they've got – they can make a Terry stop. But then – but – well, they can. The question is, did they do it properly? And that's something they have to establish. Well, I think that there's – they had the reason to make the Terry stop. Now, if there was anything wrong with putting her in handcuffs and putting her in the back seat temporarily, she should have said, he kicked me, he threatened me, he pushed me over. That's her burden to say there's something wrong with that. But I would really – I guess I want to hear from the other side. Yes, we've spent a – May I say one thing? No, no, save it for a bundle, please. Let's hear what the government has to say. We could be at this for another 10 minutes or so, and your colleague is anxiously waiting because she's very – Anxiously, Your Honor. May it please the Court, Rachel Hernandez for the United States. The issue of the facts before the district court are reviewed for clear error. The record clearly supports the finding there is no error with regard to the factual determination made by the district court below. The district court correctly denied the motion to dismiss for several reasons. But I'll draw your attention to, I think, the easiest and maybe worst-case scenario. If – even if this court were to find that the detention in this case were somehow illegal or that it were an illegal arrest, the fact that the consent was voluntary, which the defendant admits in her reply brief at page 9 that the consent was voluntary, this court can still find that the seizure was valid. And the issue there would be whether the consent was tainted. And to determine that, we would look at the test set forth under Patser. Were Miranda warnings given? They were, in fact. Was there any intervening circumstances? There were. She was unhandcuffed during this detention. She was given additional freedom as this encounter went on. She – she was unhandcuffed. She was allowed to accompany the officer to the room. He explained to her numerous times that she could limit the scope of the search or stop the search. He asked her to accompany her at various points in the room, for instance, near the bathroom. If there were personal items, he did – she did not want him to search. Near drawers. So she was actually given more freedom during this detention as it went on. And the fourth factor. She was not free to leave. Well, I think a reasonable person under that circumstance would think that. She would not think that. She was unhandcuffed. Right. But didn't he say you're not free to leave? He said that at the outset, yes. That's when she was in handcuffs. So at what point did he say you're free to leave? Well, he didn't say you're free to leave. Would a reasonable person say at any point in this that I can run out of here and not be detained? Of course, the officer is not required to say you're free to leave before asking for consent. Of course. However. You said she was free. Well, I know her privilege. I guess to answer that question, Your Honor, I would say what factors I would point to is the fact that she was taken out of the patrol car. She was allowed out of the patrol car. She was unhandcuffed. She was allowed to go back upstairs. She was allowed freedom of movement in the room. I think those factors would cut in favor of someone believing that the situation has changed, that they do have a freedom that you don't have when you're in the back of a patrol car in handcuffs. Counsel, let's get to the central problem for me, and that's the questions that the officer asked. You cite in your brief at page 16 the Murillo case, and that was a car stop. And the holding there was that you must limit your questions to the reason for the stop. And you say, well, that was a car stop. But I would think it would apply here equally. Well, Your Honor, I do distinguish it as a car stop versus an ongoing investigation where there's surveillance, there's marked and unmarked cars. There is a different scenario in that situation. But I think also here the investigation was stolen cars. Well, Your Honor, I would actually say that it is incorrect to look at this as two separate investigations, one into drugs and one into stolen cars. It just happened that this officer who was involved in drug investigations came there. So he decided to help them out with their stolen car investigation. Well, Your Honor, I would actually say that there's references in the record to the fact that this is actually one investigation. The defendants were seen coming and going from the hotel room. There were coordination between this officer who testified and the officers on the scene over the radio prior to his arrival. There, these individuals are part of a group being watched, as I said, coming and going from the room. But counsel, there's evidence here and the officer testified to it that he had come there in connection with a completely separate investigation. That's what he said. That is true, Your Honor. However, he also said that he explained to the defendant his observations at the scene that this was not just a stolen car investigation. What did he observe at the scene that made him think she might have drugs? Well, what was occurring at the scene that made him feel that way? And again, this is an experienced drug investigation officer, that this had something to do with methamphetamine and not just drugs in general, but methamphetamine. Question was, what did he observe that made him think that? He observed the people involved, the location, which he was familiar with, the cars that were involved, the type of cars that were involved, the fraudulent license plate tag that was on one of the cars, and what he overheard by monitoring the radio, that the people were coming and going to the room. It was based on those suspicions and those observations, I should say, that he told the defendant at the time that based on those observations, he thought that what was happening had something to do with methamphetamine. He testified to that fact. I would say that those factors, along with the fact that the defendant was seen as a passenger in a stolen car, that she was part of the surveillance that had been ongoing, that they had been going back and forth to the hotel room, that this was, in fact, one joint investigation. In fact, the officer conducted a protective sweep of the hotel room, which is some indication of interrelatedness of the hotel room with the stolen car. And based on that and the totality of the circumstances as set forth under RVSU, it was a reasonable suspicion to conduct a Terry stop. If he had been going to the room to look for license plates that had been removed or if he'd been going to the room for car registrations, that would be different. But to go there on a drug search seems to me beyond what this Terry stop was all about. Well, Your Honor, I guess I would just point to the detective's experience with methamphetamine and what he relied on at the scene and what he relied on while monitoring the radio traffic on approaching the scene to give him a particular basis to believe that methamphetamine crime was involved. With regard to the government ---- May I stop you right there? What he said was, I believe that there was a ---- this is what he's telling her. There's a likelihood that what was occurring would have something to do with methamphetamine based on the people that were involved. What did he mean by that? Well, Your Honor, methamphetamine, as I'm sure this Court is aware, is a ---- is an extremely harsh substance. It ---- the people who are involved are usually of a certain look, a certain ---- the ravages that it produces on the body, the location of where this was happening was another ---- Counsel, you're telling us that he got this information on the radio before he got there. Both, Your Honor, that on the radio he was able to ascertain what was going on, that there were people going to and from a room, that there were stolen cars, that there was a false license plate tag. When he got there ---- You got a fake license plate and their parents. Is that what we have? And the location of the crime, which is, I believe, in that same sentence that Your Honor was reading. A little bit further. I found this is a pretty common in that area to be involved in methamphetamine type crimes. And so he's talking about the location. That's what you say. Yes, Your Honor. And so the government, the government asserts that this is part of one investigation and, therefore, the Terry stop was based on reasonable suspicion of an ongoing criminal activity, the stolen cars going back and forth to the hotel room and the suspicion of methamphetamine. However ---- Well, can I ask you, why would the stolen cars have anything to do with illegal drugs? Well, the detective testified that in his experience, the stolen cars go hand in hand with the methamphetamine crime, particularly in that area, particularly with the fraudulent license plate tag. All of those circumstances together. Yes, sorry to interrupt, but he's not involved in the investigation. He's there by complete chance. That's true. Right. Well, no, he said, how did you become involved? Were you part of the investigation going on there? I was not. I was attempting to contact one of the officers. That's true. He wasn't he wasn't going to that scene by any means because of his involvement. However, on his way there, he did monitor what was happening. And because of that, he knew what was going on as he arrived. He knew that there were marked and unmarked cars. He knew before he got there the room number that was involved with these individuals. So they think it's stolen cars. He's a DEA agent, so he has a little different orientation. So he gets on the scene. He says, these are meth users, and I'm going to go question them. That's a different investigation, isn't it? Well, no. The government feels that it's not, that because of what he said, because of his particularized reasons that he set forth for why he felt that that's what was happening, it is one investigation. However, even if, Your Honor, you do not accept that, that this is one investigation, under Murillo, this will, and under the cases cited by the defendant, this was not unduly prolonged, protracted, beyond the scope. This occurred during the stolen car portion of the investigation. Let's just say for ease of speaking here today, if this Court thinks that that's a separate investigation. But just assume hypothetically. Hypothetically, it's a separate investigation. The investigation into the room and to the drugs was simultaneous. There's instances in the record which make clear that while he was up in the room, the investigation was still occurring in the parking lot. When he first did a protective sweep of the room, it took no more than 10 to 30 seconds. So a consent search of the room, while more thorough, would not take much longer than that. The investigation was still going on in the parking lot. He brought the bag, which the defendant had abandoned, down to the officers who were still there. So it was a simultaneous search. I just have a... Go ahead, please. ...just to finish my thought. As I said, the defendant has conceded that the consent was voluntary. Based on that, even if there was something improper with the detention, the defendant the search is still proper because the consent was not tainted. Additionally, as the government argued, the defendant had abandoned the bag, voluntarily abandoned the bag during a voluntary consent. As the defendant stated, the consent was valid and voluntary. You would agree, though, wouldn't you, counsel, that if the search was improper, that we would suppress the bag, even though she said it didn't belong to her? Your Honor, the cases on this point are distinguished, I think, from the situation here. The case, the main case that the defendant cites, too, with regard to that is Stevens, which was an extreme situation where the defendant was on a bus. It was not a consensual situation. He was not given the impression that he could leave or that the compliance with what the officers were asking for appeared to be required. That's not the case here. The defendant admits that her consent was valid and voluntary. And so if her consent was valid, her abandonment. My hypothetical, the search was invalid. If the search was invalid, then you would not allow the bag, which was picked up during that, even though she said it doesn't belong to me. That wouldn't make any difference. It's part of an illegal search. Is that not correct? That's correct, Your Honor. And there's no further questions? I think we understand your position. Thank you. You have two minutes. Thank you, Your Honor. We'll try not to extend you with questioning beyond that. The government seems to be indicating to this Court that there was a single investigation. We dispute that. But even if that were the case, I cite to the Court the Delgadillo case. I'm not sure if I'm pronouncing that correctly, but it's in my brief, where they say the circumstances, as I said earlier, are similar, but even more egregious than here. In that case, the agents suspected that the people in the apartment that they were surveilling were drug dealers. And then they watched them for a few days, and then when they saw them in the street somewhere engaging in conduct that to them seemed to be a drug deal, they detained them. They stopped them. And then, like this case, one officer went up to the apartment, did a protective  Both of the activities, the two activities, were drugs. And this Court didn't see that, the fact that it was a single investigation, that as a deciding factor. The issue that the government just stated about, if the consent was voluntary, therefore the abandonment was also voluntary, respectfully is wrong. The analogy is more to, yes, the consent is voluntary, but is the consent valid where the seizure, the initial seizure was invalid? Here, yes, the consent was voluntary, but the what the case says that I've cited to the Court is that the abandonment is considered involuntary if the initial seizure was invalid. So there's a distinction there. The one thing I was going to say at the very end when I was standing up, I even tried to extend my time longer than was necessary, is no, that's all right. We were asking questions. Thank you, Your Honor. Again, going on memory, relating or addressing Judge Noonan's concern or issue about whether the Court can rely on the summary of facts that I included in my motion. First, I want to repeat that I even if the Court were to adopt those facts, I suggest they're insufficient in a fact-intensive inquiry. But beyond that, there is a Ninth Circuit case, and I'll be happy to file supplemental brief if the Court wants it, that says that even where there is a question as to whether or not a pleading submitted to the Court by counsel is to be accepted as fact, where if the defense or the attorney later on disputes that in the hearing, then it cannot be accepted as fact. And clearly in this case, when Judge Martone asked me if it would be appropriate for him to rely on those facts, I said no, it wouldn't. And I explained why as we talked about earlier. Kennedy. That's right. You did make it clear, though. I think you confused them as much as you confused me. Well, I didn't intend to confuse you. It is a difficult issue. But again, Judge Martone did not follow through with what he was thinking of doing and cite in his order that he was taking the facts from my motion. As to, you know, we dispute that the officer, Detective Shea, had a sufficient basis to even suspect, let alone conclude, that there was methamphetamine up in Ms. King's room. If Your Honor were to accept the facts that or the statement that was in the motion, what I said there is that Ms. King was in a room different from the one that the defendants were there surveilling, totally different. And that is in so if Your Honor accepts that, it actually works, I suggest, to our advantage. But I do want to just say one, you know, quote, Florida v. Royer, which says that the scope of the detention, and they're talking about the Terry stop, must be carefully tailored to its underlying justification. And in this case, it was to determine her connection to the stolen car. This much, however, is clear. An investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. That wasn't the case here. Clearly, not a single officer approached her to ask her questions about the stolen car. It is true that the – I guess Judge Fletcher, that the fact that she was in a stolen car came up when Detective Shea was talking with her. But none of it – but that wasn't in the context of him trying to dispel their suspicions. It was after he had told her, we're no longer investigating the car. This is now a drug investigation. So with that, Your Honor, I would submit. Roberts. Thank you very much for your arguments. And we'll be in recess for the day. Your score for this session stands adjourned. For more information visit www.FEMA.gov
judges: B. Fletcher, Noonan, Thomas